IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KEVIN C., THERESA C., INDIVIDUALLY AND AS PARENTS AND NATURAL GUARDIANS OF B.C., Plaintiffs, | CIVIL ACTION |
| v. | NO. 20-6431 |
| FOUNDATIONS BEHAVIORAL HEALTH, GINA M FUSCO, MOHAMMED YUSUF MODAN, JON LYFORD, ANTHONY CUSATE, WENDY MONTE, DANA BACHMAN, DONNA NEWTON-PUTIGNANO, AMY DOLLINGER, TIM (LAST NAME UNKNOWN), BERNARD OTABIL, UNKNOWN EMPLOYEES, UHS OF DELAWARE, INC., AND UNIVERSAL HEALTH SERVICES, INC., Defendants. | |

## MEMORANDUM OPINION

Kevin C. and Theresa C., individually and as parents and natural guardians of their son, B.C., allege that Bernard Otabil, who was employed at Foundations Behavioral Health ("FBH"), a psychiatric hospital in Pennsylvania, physically abused B.C. during his inpatient stay at FBH, causing severe physical and emotional trauma. Accordingly, they have sued Otabil, FBH and related corporate entities ("the Corporate Defendants"),[1] and multiple FBH officers and employees asserting a variety of federal statutory and state common law claims.

Defendant Mohammed Modan, B.C's doctor at FBH and all of the other Defendants except for Otabil have filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Modan's motion to dismiss will be granted, and the

---

[1] The Corporate Defendants include (1) FBH, which is incorporated as Universal Health Services of Doylestown, LLC; (2) Universal Health Services, Inc. ("UHS"), a Delaware corporation that owns and manages healthcare facilities; and (3) Universal Health Services of Delaware, Inc., the management branch of UHS.

remaining Defendants' motion to dismiss will be granted in part and denied in part.

I.      BACKGROUND[2]

B.C. is an adult with severe Autism Spectrum Disorder.  In January 2019, he was admitted into the crisis unit of a local hospital after his family became concerned that he might harm himself or others.  Two days later he was transferred to FBH.  Once he was admitted Modan recommended that he be treated on an inpatient basis for 30 days and monitored every 15 minutes.  Modan noted in B.C.'s treatment chart that B.C. was non-verbal and had to use an iPad to communicate.  B.C.'s room at FBH was located near a nurse's station where FBH employees gathered to perform work-related tasks.  Despite Modan's recommendation and the proximity of B.C.'s room to the nursing station, B.C. was not monitored every 15 minutes.  Nor was he allowed to use an iPad to communicate.  Instead, B.C. was "locked in his room alone and in the dark for hours at a time."

FBH employed Defendant Otabil as a mental health technician during B.C.'s inpatient stay, in which capacity Otabil "was to provide care, comfort, and treatment to B.C."  Otabil was violent to B.C., however, and FBH's surveillance system twice captured video demonstrating Otabil's physical abuse.  Specifically, video shows on January 9, 2019, Otabil unlocking B.C.'s room and "immediately beg[inning] to push and shove" him, "continuously abusing B.C. for a period of approximately thirty (30) minutes as Otabil yells at, pushes, shoves, drags and strikes B.C. repeatedly in the course of stripping and showering B.C."  Otabil's actions were in "full view of fellow FBH employees," who did not intercede.  Instead, video shows "FBH employees talking, laughing, rolling through hallways on chairs, [and] using their cell phones to talk or text

---

[2] The following facts are drawn from the allegations of the Amended Complaint and are taken as true, as required on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

2

all the while ignoring Otabil's abuse of B.C." Video taken two days later shows Otabil "yelling at B.C. and pushing and shoving B.C. while directing B.C. to his room at FBH," similarly in view of other employees who did not intervene. Defendants did not monitor the video surveillance system, which would have revealed Otabil's abuse, and did not review any of the video for evidence of abuse until FBH was investigated by Bucks County Child Protective Services ("Child Protective Services") as a result of B.C.'s injuries.

Defendants were "on notice of . . . Otabil's propensity to harm patients" even before B.C. was admitted because Otabil had physically abused another FBH patient just one month previously. Child Protective Services investigated and found that child abuse was "Indicated." Further, Otabil's abuse of B.C. "was not unexpected" because the Corporate Defendants "have been repeatedly cited and sued for insufficient staffing, training, and various incidents of abuse, both locally and across the nation." Nevertheless, none of Defendants took action to terminate Otabil because of the allegations of physical abuse of Ryan M., but instead entrusted B.C. to Otabil's care.

Defendants' motions seek to dismiss Plaintiffs' federal statutory claims against the Corporate Defendants under the Rehabilitation Act, 29 U.S.C. § 794, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182(a), as well as Plaintiffs' Pennsylvania state law claims for breach of fiduciary duty, assault and battery, and negligent and intentional infliction of emotion distress against the Corporate Defendants and Otabil, and the negligence claims against all Defendants.[3]

---

[3] Count I of the Complaint is labelled as a claim for "Negligence, Gross Negligence, And Recklessness." Under Pennsylvania law, negligence, gross negligence, and recklessness are not separate causes of action, but are instead recognized as different "degree[s] of deviation from the standard of care" actionable under a single cause of action, negligence. *Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 19 (Pa. 2019)*; see also Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 215 n.2 (3d Cir. 2010) ("[T]here is no separate cause of action under Pennsylvania law for gross negligence," although "Pennsylvania courts acknowledge differing standards of care" (quotation marks and citation omitted)); *Archibald v. Kemble*, 971 A.2d 513, 519 (Pa. Super. 2009) ("Recklessness . . . refers to a degree of care," but "the

II.     **STANDARD OF REVIEW**

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  Upon consideration of such a motion, all factual allegations of the complaint and reasonable inferences that can be drawn from them are accepted as true and viewed in the light most favorable to the plaintiff.  *DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 215 (3d Cir. 2007).  Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action" are not accepted as true, however, as "we are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quotation marks and citation omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quotation marks and citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).

III.    **DISCUSSION**

    A.  **Federal Statutory Claims**

        i.  *ADA Claim*

The ADA is "a clear and comprehensive national mandate designed to eliminate discrimination against individuals with physical and mental disabilities across the United States." *McGann v. Cinemark USA, Inc.*, 873 F.3d 218, 221 (3d Cir. 2017) (quotation marks and citations omitted).  Title III of the ADA provides, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns,

---

cause of action remains sounding in negligence.").

4

leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).  Thus, "[t]o state a claim of disability discrimination under Title III of the ADA, a plaintiff must show (1) discrimination on the basis of a disability; (2) in the full and equal enjoyment of goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation; (3) by the public accommodation's owner, lessor or operator." *Anderson v. Franklin Inst.*, 185 F.Supp.3d 628, 642 (E.D. Pa. 2016) (quotation marks and citations omitted).

"The term 'discrimination' is not directly and uniformly defined in Title III.  Instead, the statute provides several general prohibitions that constitute discrimination for purposes of the general rule found in 42 U.S.C. § 12182(a)." *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 116 (3d Cir. 1998) (quotation marks and citation omitted).  These general prohibitions include, *inter alia*, "subject[ing] an individual . . . on the basis of a disability or disabilities of such individual[,] . . . directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual . . . to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations" of a public accommodation.  42 U.S.C. § 12182(b)(1)(A)(i).

The Corporate Defendants do not dispute that Plaintiffs have adequately alleged that B.C. is disabled, that FBH is a place of public accommodation, and that B.C. was denied the full and equal enjoyment of goods and services of FBH.  They instead argue that the Complaint fails to allege facts sufficient to plausibly claim that "B.C. was denied access to treatment or other services at FBH while non-handicapped individuals were . . . provided with such treatment and services," and thus has not adequately pled discrimination on the basis disability.

Plaintiffs *have* alleged facts sufficient to plead discrimination.  The Complaint avers that B.C. was "locked in his room alone and in the dark for hours at a time" and physically abused by

Otabil. B.C. is non-verbal, and therefore "was unable to communicate to others the nature and extent of the abuse that he was subjected to at FBH." Thus, "B.C. was unable to . . . communicate about the fact that FBH staff was not providing to him a safe and properly supervised residential program." Moreover, the Complaint explicitly alleges that "[s]ince B.C. was unable to report the abuse, neglect and failures on the part of FBH due to his non-verbal nature, B.C. was treated differently than a nondisabled individual would be treated." Taking these allegations as true, B.C. was denied the opportunity to participate in or benefit from treatment available at FBH on the basis of his non-verbal status, and was therefore discriminated against for purposes of the ADA.[4]

### ii. Rehabilitation Act Claim

Section 504 of the Rehabilitation Act prohibits federally funded programs from discriminating against or denying benefits to disabled persons based solely on their disability. 29 U.S.C. § 794. The statute provides, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or

---

[4] In arguing that Plaintiffs have not adequately alleged discrimination, Defendants emphasize that FBH "admitted B.C. as a residential patient for treatment" and that B.C. was "admitted for FBH's treatment services because of his disability." Discriminatory conduct prohibited by the ADA extends beyond mere exclusion from a public accommodation, however. *See* 42 U.S.C. § 12182(b)(1)(A)(i); *see also, e.g.*, *Olmstead v. L.C. by Zimring*, 527 U.S. 581, 598, 601 (1999) (holding that unnecessary institutional segregation of persons with mental disabilities was discriminatory as it required "persons with mental disabilities . . . [to] relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice.").

Defendants also argue that Otabil's physical abuse of B.C. "is not the type [of conduct] targeted by the ADA for eradication," as the ADA is "meant to prohibit conduct and conditions that . . . inhibit a person's full participation in a treatment program," and not to "supplant state-law battery claims." The Complaint, however, clearly premises its claim of discrimination on more than Otabil's physical abuse. *See also* 42 U.S.C. § 12101 (purpose of the ADA is "to invoke the sweep of congressional authority . . . to address the major areas of discrimination faced day-to-day by people with disabilities," in light of the findings that "discrimination against individuals with disabilities persists in such [a] critical area[] as . . . health services" and includes "various forms of discrimination," including "the discriminatory effects of . . . communication barriers").

activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  To state a claim under Section 504 a plaintiff must allege facts showing that: (1) he is an "individual with a disability" as defined under the statute; (2) he is "otherwise qualified" for participation in the program or the benefit denied; (3) the program receives "federal financial assistance"; and (4) he was "excluded from the participation in," "denied the benefits of," or "subjected to discrimination" in the program "solely by reason of her or his disability." *Id.*; *see also Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3d Cir. 1991).  Section 504's use of the phrase "solely by reason of" an individual's disability imposes a "causation requirement." *Menkowitz*, 154 F.3d at 124.  To satisfy this causation requirement, "Plaintiffs must prove that they were treated differently based on the protected characteristic, namely the existence of their disability." *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 (3d Cir. 2013).  However, because Section 504's "causation requirement requires disability to be the sole cause of discrimination, an alternative cause is fatal to [the] claim because disability would no longer be the sole cause." *Id.* at 236 n.11.

Here, Defendants contend only that Plaintiffs have failed to allege facts sufficient to establish the fourth element of their Section 504 claim.  Specifically, Defendants argue that the Complaint does not adequately allege that: (1) B.C. was denied treatment benefits at FBH that were provided to non-handicapped individuals; and (2) B.C. was discriminated against "solely by reason of" his disability.

For the same reasons as with Plaintiffs' ADA claim, the facts alleged in the Complaint, taken as true and granting all reasonable inferences to Plaintiffs, are sufficient to plead that B.C. was "deprived of meaningful access to a benefit to which [he] was entitled" that persons without his disability received, to wit, the ability to participate in and receive safe and appropriate treatment at FBH.  *Id.* at 237.  Plaintiffs thus have adequately alleged that B.C. was "excluded

from the participation in" and "denied the benefits of" treatment at FBH by reason of his non-verbal status. Plaintiffs also have adequately alleged that the sole reason B.C. was unable to report his neglect, physical abuse, and injury, and thus was excluded from participating in the FBH program, was because of his disability, his inability to communicate verbally because of his severe Autism Spectrum Disorder. Further, although the Complaint does not explicitly allege that his disability was the reason why B.C. was locked in a dark room and abused by Otabil, on a motion to dismiss, all reasonable inferences from the facts alleged must be drawn in the light most favorable to plaintiffs. *Phillips*, 515 F.3d at 228. Here, Plaintiffs allege that FBH employees were aware of B.C.'s disability, denied him the tools they knew he needed to communicate, and failed to intervene even as they saw him being mistreated. Moreover, the Complaint alleges that Otabil's violent conduct towards B.C. occurred while showering B.C. and directing him towards his room – tasks required to be performed precisely because of B.C.'s severe Autism Spectrum Disorder.

### B. Claims Under Pennsylvania Law

#### i. *Negligence*

"There are four elements to a cause of action for negligence: a duty of care, a breach of that duty, a causal connection between the defendant's conduct and the resulting injury, and damages." *Zeidman v. Fisher*, 980 A.2d 637, 639 (Pa. Super. 2009) (citation omitted). A breach of duty occurs where "the defendant's act or omission fell below the standard of care, and, therefore, increased the risk of harm to the plaintiff." *Green v. Pa. Hosp.*, 123 A.3d 310, 316 (Pa. 2015) (citation omitted).

Defendants move to dismiss Plaintiffs' negligence claim against the FBH officers and employees as well as the Corporate Defendants. They do not dispute that Defendants had a duty

of care or that the Complaint has failed to adequately allege that Plaintiffs were injured. Instead, they seek dismissal on the grounds that Plaintiffs have failed to allege facts sufficient to show that Defendants' breach was grossly negligent or involved willful misconduct, as required under the Mental Health Procedures Act, 50 P.S. § 7101, *et seq.* ("MHPA").[5]

The MHPA "protects from civil and criminal liability those individuals and institutions that provide treatment to mentally ill patients, and thus promotes the statutory goal of ensuring such treatment remains available." *Dean v. Bowling Green-Brandywine*, 225 A.3d 859, 869 (Pa. 2020) (citation omitted). It provides that "a director of a facility, a physician, . . . or any other authorized person who participates in a decision that a person be examined or treated under [the] act . . . shall not be civilly or criminally liable for such decision or for any of its consequences" in the absence of "willful misconduct or gross negligence." 50 P.S. § 7114(a).[6]

For purposes of the MHPA, gross negligence is conduct that is "substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care." *Albright v. Abington Mem'l Hosp.*, 696 A.2d 1159, 1164 (Pa. 1997) (citation omitted). Such conduct need not, however,

---

[5] Defendants also argue that the negligence claims against FBH officers and employees – Gina Fusco, Jon Lyford, Anthony Cusate, Wendy Monte, Dana Bachman, Donna Newton-Putignano, and Amy Dollinger – must be dismissed because the Complaint "lack[s] . . . requisite factual content that the[se] individual Defendants caused the harm." Defendants fail to address any relevant Pennsylvania law for their argument that Plaintiffs have failed to allege facts sufficient to show the element of causation. On a motion to dismiss under Rule 12(b)(6), "[t]he defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted). As Defendants have failed to meaningfully address whether Plaintiffs have adequately alleged causation, their Motion to Dismiss will not be granted on this ground. *See also* Local Rule of Civil Procedure 7.1(c) (requiring that motions "be accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support of the motion"); *Miller v. Cadmus Commc'ns*, 2010 WL 762312, at *5 (E.D. Pa. Mar. 1, 2010) ("Pursuant to Local Rule 7.1(c), all litigants are required to address substantive matters in a meaningful manner.").

[6] Defendants contend, and Plaintiffs do not dispute, that the MHPA applies to each Defendant in this case. *See also Dean*, 225 A.3d at 869 ("We have broadly interpreted protected 'persons' under [the MHPA] to include hospitals and other treatment facilities as well as their employees because denying such entities immunity would undermine the goals of the MHPA." (citation omitted)).

"rise to the level of the intentional indifference or conscious disregard of risks." *Feleccia*, 215 A.3d at 20 (quotation marks and citations omitted). "[T]he issue of whether a given set of facts satisfies the definition of gross negligence is a question of fact to be determined by a jury," and the issue can be decided as a matter of law only "if the conduct in question falls short of gross negligence, the case is entirely free from doubt, and no reasonable jury could find gross negligence." *Albright*, 696 A.2d at 1164-65 (citations omitted).

Here, the Plaintiffs allege that Defendants' conduct breached their duties to "adequately hire, train, supervise, and discipline its staff and its program" and "provide B.C. a safe, secure, and adequately staffed treatment program with reasonable care for the heightened needs of its clients, including B.C." The Complaint alleges that many of the individual Defendants were employed in supervisory roles at FBH, including: Gina Fusco (Chief Economic Officer), Anthony Cusate (Director of Inpatient Services), Wendy Monte (a "supervisor" and "B.C.'s case manager"), Dana Bachman (Assistant Director of Nursing), Donna Newton-Putignano (Senior Director of Behavioral Services), and Amy Dollinger (Director of Compliance for Personal Injury and Risk Management). Further, the Complaint describes how the Defendants failed to protect B.C. from harm, including that they: (1) "fail[ed] to monitor [B.C.] every fifteen (15) minutes" as B.C.'s doctor, Modan, recommended at admission; (2) "did not monitor [FBH's] camera system which would have revealed the abuse perpetrated upon B.C."; (3) "did not take any action to terminate Otabil" as a consequence of his abuse of B.C., but instead "permitted [him] . . . to further abuse B.C. on subsequent dates"; and, (4) "permitted Otabil to remain employed at FBH [and] entrusted B.C. to his care" despite knowing of Otabil's abuse of another FBH patient shortly before.

Plaintiffs' negligence claim survives against Fusco, Cusate, Monte, Bachman, Newton-

Putignano, and Dollinger, because they held roles at FBH that, viewing the facts alleged in the light most favorable to Plaintiffs, substantiate the inference that they held supervisory roles over Otabil, B.C.'s abuser: rather than stop the abuse, or terminate Otabil knowing of his propensity to physically abuse patients they did nothing. In light of the "serious warning signs" concerning Otabil's treatment of patients and B.C., a reasonable jury could find that these Defendants' alleged conduct extended beyond ordinary carelessness and indifference, and instead constituted a flagrant departure from their supervisory roles and, as such, were grossly negligent.[7]

By contrast, there are insufficient factual allegations as to Mohammed Modan and Jon Lyford to support the inference that they were grossly negligent. There are no allegations that they held supervisory roles with any connection to Otabil's conduct in relation to B.C. Instead, the Complaint merely alleges that they were involved at B.C.'s admission to FBH. The Complaint's sole factual allegation as to Lyford's role is that he was "Director of Admissions at FBH." It is alleged that Modan was a psychiatrist and "B.C.'s doctor at FBH," and that he offered several treatment recommendations when B.C. was admitted, which are not alleged to have deviated from his standard of care. Nothing in the Complaint points to gross negligence on their part.[8]

---

[7] Defendants also move to dismiss Plaintiffs' claims against the Corporate Defendants on the grounds that the Plaintiffs have failed to allege facts showing they engaged in grossly negligent conduct. For much of the same reasons set out above, Plaintiffs have adequately alleged that the Corporate Defendants were grossly negligent by (1) failing to ensure B.C.'s safety by allowing Otabil to care for B.C. after Otabil was implicated in an investigation into abuse of a minor patient at FBH; (2) failing to adequately supervise employees by allowing Otabil to continue to care for B.C. after multiple staff observed Otabil's abuse; (3) failing to ensure B.C. received an iPad to communicate his needs; and, (4) leaving B.C. locked in a dark room for hours at a time rather than monitoring him every 15 minutes as recommended by his physician.

[8] For the same reasons, Plaintiffs have failed to adequately allege that Modan and Lyford acted with willful misconduct. *See Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 175-76 (3d Cir. 2004) ("Willful misconduct occurs when the danger to the plaintiff, though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong." (quotation marks and citation omitted)).

### ii. *Vicarious Liability*

Defendants move to dismiss the tort claims against FBH to the extent they are asserted as claims for vicarious liability for Otabil's conduct. They contend that the allegations of the Complaint do not adequately support the imposition of vicarious liability against the Corporate Defendants because the Complaint does not allege facts sufficient to show that Otabil's conduct was within the scope of his employment.

Under the doctrine of *respondeat superior*, an employer can be held vicariously liable for the acts of its employee "which cause injuries to a third party, provided that such acts were committed during the course of and within the scope of the employment." *Costa v. Roxborough Memorial Hosp.*, 708 A.2d 490, 493 (Pa. Super. 1998). Such liability "may extend even to intentional or criminal acts committed by the servant." *Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1271 (Pa. Super. 1979) (citations omitted). The Pennsylvania Supreme Court has adopted the Restatement (Second) of Agency's scope of employment analysis in vicarious liability cases, *See Just. v. Lombardo*, 208 A.3d 1057, 1068 (Pa. 2019), which provides in pertinent part that "[t]he conduct of an [employee] is considered within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the [employer], and (d) if force is intentionally used by the [employee] against another, the use of force is not unexpectable by the [employer]." Restatement (Second) of Agency § 228(1). Further, "to be within the scope of employment, conduct must be of the same general nature as that authorized, or incidental to that authorized." *Id.* § 229(1); *see also Brumfield v. Sanders*, 232 F.3d 376, 381 (3d Cir. 2000) ("[E]ven unauthorized acts may be within the scope of employment if they are clearly incidental to the [employer's] business." (quotation marks and citation omitted)).

12

An employee's conduct does not fall within the scope of employment, however, "if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." Restatement (Second) of Agency § 228(2). If "the employee commits an act encompassing the use of force which is excessive and so dangerous as to be totally without responsibility or reason, the employer is not responsible as a matter of law." *Fitzgerald*, 410 A.2d at 1272. Further, that an "act was done in an outrageous manner is indicative that the employee is not actuated by any intent of performing the business of his employer, but rather, that it is done solely through his own private malice." *Lunn v. Boyd*, 169 A.2d 103, 105 (Pa. 1961). "In such cases, the facts may indicate that the [employee] is merely using the opportunity afforded by the circumstances to do the harm, and is therefore acting outside the scope of employment." *Just.*, 208 A.3d at 1073 (quotation marks, brackets, and citation omitted).

Here, viewing the facts alleged in the light most favorable to Plaintiffs, Plaintiffs have alleged facts sufficient to plead that Otabil's alleged misconduct fell within the scope of his employment. First, Otabil's alleged misconduct occurred while performing tasks within the responsibilities of his job. Two specific incidents of abuse are alleged, one in which he "yell[ed] at, pushe[d], shove[d], drag[ged] and str[uck] B.C. repeatedly in the course of stripping and showering B.C.," and the other in which he "yell[ed] at B.C. and push[ed] and shov[ed] B.C. while directing B.C. to his room at FBH." While there is no allegation that Otabil's physical abuse of B.C. was explicitly authorized, intentional torts and even criminal acts can fall within the scope of employment if incidental to the tasks Otabil was employed to perform, as Otabil's allegedly were. *See Brumfield*, 232 F.3d at 381; Restatement (Second) of Agency §§ 229, 231.

Because Otabil's misconduct is alleged to have occurred while Otabil was taking care of

B.C. (moving him around the premises and getting him showered) and there is nothing to suggest that his abuse was as a result of "private malice" towards B.C. or to "gratify [his own] ill will." *Just.*, 208 A.3d at 1074 (quotation marks and citation omitted), the inference must be that his actions were motivated at least in part to serve FBH.

Certainly, Plaintiffs allege facts sufficient to support the inference that Otabil's use of force was not "unexpectable" given Child Protective Services past investigation of his abuse of another FBH patient. Both incidents of Otabil's abuse of B.C. occurred in "full view" of FBH employees who "ignore[d]" the abuse and did nothing "to intercede on behalf of B.C.", which could be construed by a jury to suggest that it was not outside the bounds of what they expected to see at work. *See also, e.g.*, *Straiton v. Rosinsky*, 133 A.2d 257, 259 (Pa. Super. 1957) (theater usher who "lacerat[ed] . . . the scalp" of a misbehaving child with a flashlight while removing him from the theater acted within the scope of employment). Such facts distinguish this case from those in which an employee engaged in violent brutality untethered to their employment responsibilities and thus acted outside of their scope of employment. *See, e.g.*, *Spitsin v. WGM Transp., Inc.*, 97 A.3d 774, 781 (Pa. Super. 2014) (bus company not vicariously liable for bus driver's "[p]hysical violence in . . . extreme measure" against passenger who was already "restrained" for failing to pay the fare); *Lunn*, 169 A.2d at 105 (cab company not vicariously liable for cab driver's "vicious, criminal assault" with a knife that was "for a purpose completely disassociated" from the driver's job); *Howard v. Zaney Bar*, 85 A.2d 401, 402 (Pa. 1952) (bar not vicariously liable for "excessive and dangerous" actions of bartender who shot patron in the neck for making advances on another customer).

Accordingly, Plaintiffs have alleged facts sufficient to plead that Otabil acted within the scope of his employment, and thus Plaintiffs' claims against the Corporate Defendants will not

be dismissed on that ground.

### IV. CONCLUSION

For the foregoing reasons, Modan's Motion to Dismiss will be granted. The remaining Defendants' Motion to Dismiss will be granted as to Plaintiffs' negligence claim against Lyford and denied in all other respects.

An appropriate order follows.

**BY THE COURT:**

/s/Wendy Beetlestone, J.

**WENDY BEETLESTONE, J.**