IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KEVIN C., THERESA C. INDIVIDUALLY AND AS PARENTS AND NATURAL GUARDIANS OF B.C., Plaintiffs, | CIVIL ACTION |
| v. | NO.  20-6431 |
| FOUNDATIONS BEHAVIORAL HEALTH, a/k/a UHS OF DOYLESTOWN, LLC, GINA M. FUSCO, ANTHONY CUSATE, WENDY MONTE, DANA BACHMAN, DONNA NEWTON-PUTIGNANO, AMY DOLLINGER, TIM (LAST NAME UNKNOWN), BERNARD OTABIL, UNKNOWN EMPLOYEES, UHS OF DELAWARE, INC., and UNIVERSAL HEALTH SERVICES, INC. Defendants. | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Kevin C. and Theresa C., individually and as parents and guardians of their

adult son B.C., have sued the inpatient healthcare facility where he was abused—Foundations

Behavioral Health ("Foundations")—along with several of its employees (the "Individual

Defendants"),[1] and its corporate parents[2]—UHS of Delaware ("UHSD") and Universal Health

Services, Inc. ("UHSI") (together, the "UHS Defendants")[3]—alleging that his treatment violated

---

[1] The Individual Defendants are: (1) Gina Fusco, former Foundations CEO; Anthony Cusate, Director of Inpatient Services at Foundations; (3) Wendy Monte, a therapist at Foundations; (4) Donna Newton-Putignano, Senior Director of Behavioral Services at Foundations; (5) Dana Bachman, Assistant Director of Nursing at Foundations; (6) Amy Dollinger, Director of Compliance at Foundations; (7) someone named Tim (last name unknown), employed at Foundations; and, (8) other unknown Foundations employees.  Because their identities remain unclear, these unnamed parties will be dismissed from the case.  *Scheetz v. Morning Call, Inc.*, 130 F.R.D. 34, 37 (E.D. Pa. 1990) ("[F]ictitious parties must eventually be dismissed, if discovery yields no identities.").

[2] Foundations also goes by the name UHS of Doylestown, LLC.  Per deposition testimony from multiple defendants, it is a wholly owned subsidiary of UHS of Delaware.

[3] Plaintiffs have sued both UHSD and UHSI.  The Amended Complaint, however, generally alleges misconduct by UHS in general without disaggregating the two companies, only noting that the company's "management branch" is

state and federal law.  These allegations stem from incidents involving Defendant Bernard

Otabil, who was ultimately prosecuted and found guilty of abuse of a care-dependent person and

harassment.  Specifically, Plaintiffs allege claims for negligence, gross negligence, and

recklessness (all Defendants); violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794

(Foundations and the UHS Defendants); violation of the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12182 (Foundations and the UHS Defendants); breach of Fiduciary Duty

(Foundations, the UHS Defendants, and Otabil); negligent infliction of emotional distress

("NIED") (Foundations, the UHS Defendants, and Otabil); assault and battery (Foundations, the

UHS Defendants, and Otabil); and, intentional infliction of emotional distress ("IIED")

(Foundations, the UHS Defendants, and Otabil).

 Defendants have moved for summary judgment on all counts under Federal Rule of

Procedure 56.  Fed. R. Civ. P. 56(a).  For the reasons that follow, Defendants' motion will be

granted in part and denied in part.[4]

## I. BACKGROUND

 Based on a review of the record, the facts underlying this suit are as follows.  Except

where noted, they are not in genuine dispute.

 B.C. has severe autism spectrum disorder who is nonverbal and, per Plaintiffs' Amended

Complaint, incompetent.  B.C.'s parents testified that he had started to exhibit more aggressive

behaviors, which worsened in late 2018.  One night in early January 2019, he became

particularly agitated and grabbed his father by the neck.  Police had to be summoned to

---

UHSD.  The parties also treat them interchangeably in their summary judgment briefing.

[4] Defendant Bernard Otabil, who is represented by separate counsel from the other Defendants, did not move for summary judgment on any of Plaintiffs' claims against him.

deescalate the situation.  They then took B.C. to Saint Claire's Health in Boonton, New Jersey for emergency care.  At Saint Claire's, a psychiatrist recommended that his medications be changed and discussed possibly transferring him to a specialized inpatient unit at Foundations. Two days later, he was transferred there for "a higher level of care."  B.C.'s parents testified that they planned for their son's placement at Foundations to be temporary; in Kevin C.'s words, the facility "would monitor [B.C.'s] medication or get his medication in line for three weeks, and then once it was aligned, he could come home with us."

Upon arrival at Foundations, B.C. was placed in the Magnolia unit.  Foundations, including the Magnolia unit, has 24/7 camera surveillance, and although the cameras are not actively monitored around-the-clock, the record includes testimony that Defendant Gina Fusco, Foundations' CEO, Defendant Amy Dollinger, head of compliance, Defendant Dana Bachman, Chief Nursing Officer, and nursing units all have access to live feeds of their footage, (although Bachman disputed that she had such access).

A team of physicians, nurses, and mental health technicians took care of B.C. while he was at Foundations.  The mental health technicians' responsibilities included managing patient safety and the day-to-day care of patients, including helping clean their rooms, bathing them, and preparing meals for them as needed.  Bachman testified that these duties would include helping to clean up a patient and his room if he were to soil himself.  Anthony Cusate, former Director of Inpatient Services and Social Work at Foundations, elaborated that a mental health technician would be responsible for redirecting a patient who was not where he was supposed to be, including back into his room for bedtime.  Mental health technicians (or another provider) also were supposed to check on B.C. every fifteen minutes and fill out rounds paperwork documenting where he was and any incidents of note.  (Based on video evidence and testimony

from Otabil, Bachman, and Fusco, however, there is an open question as to whether this practice was followed in every instance.)

Because B.C. is nonverbal, he communicates in part via assistive technology downloaded onto an iPad.  Upon arrival at Foundations, staff made clear to B.C.'s parents that he would not be able to use the iPad.  Instead, he was given a picture exchange communication system ("PECS").  Multiple employees testified that, because of its camera and internet connectivity, an iPad would have been problematic given the requirements of the Health Insurance Portability and Accountability Act, and, also, could have caused fights between patients.

This lawsuit stems from a series of interactions between B.C. and a mental health technician named Bernard Otabil starting on January 9, 2019, which were captured on Foundations's 24/7 video surveillance feed.  Otabil testified in his deposition that, when he arrived in the Magnolia unit that evening, he was upset to learn that B.C. had been left in his room for several hours with the door closed.[5]  Otabil found B.C. covered in his own feces, having smeared it across his room—something that he sometimes did, as noted in his intake sheet at Saint Claire's and in other medical records.

Videotape of this incident, which does not capture any sound, shows Otabil directing B.C. out of his room, taking his therapy ball away from him, and forcefully grabbing him by the left arm.  B.C. subsequently fell to the floor, but it is unclear from the video alone whether the force of Otabil's contact with his left arm caused B.C. to fall, or if B.C. moved to the ground on his own accord.  Regardless, as B.C. was going down, Otabil shoved him again in the back. Now on the floor, B.C. then reached for his therapy ball, and Otabil pushed him down again with

---

[5] In their Amended Complaint, Plaintiffs characterize what happened as B.C. having been "locked in his room."  But multiple Foundations employees testified that the door could lock only from the outside.  So while Foundations staff or other patients could not enter without a key, B.C. always was free to leave.

one arm, this time with less force.  Otabil then kicked the therapy ball back into B.C.'s room and, with another lighter push in the back, directed B.C. back into his room.  Throughout this interaction, multiple Foundations employees can be seen on the video, none of whom intervened in response to Otabil's actions.

Once back in his room, Otabil helped B.C. take his shirt off (per his testimony, to bathe him in the shower adjoining his bedroom).  When B.C. then tried to get back on the therapy ball instead of showering, Otabil grabbed him by the left arm with both hands and swung him around to pull him away, causing B.C. to fall to the floor again.  Holding B.C.—still on the ground, now on all fours—with his left hand, Otabil spanked him with his right hand.  For the next few minutes, B.C. occasionally comes back into view, naked, apparently as Otabil attempts to bathe him.

Otabil is next seen clothing B.C. in sweatpants and a t-shirt.  When B.C. tries to leave his room, Otabil places his right arm across B.C.'s body and directs him off-screen, this time more gently.  Otabil then turns the light out in B.C.'s room and walks out, leaving the door open.  B.C. follows a few seconds later, and when Otabil notices him, he again redirects B.C. to his room, first by stopping and walking him, and then by pushing on B.C.'s back twice with both hands.  Otabil's second push landed B.C. on the floor again, but it is unclear whether he fell as a result of the force of Otabil's push or if B.C. went to ground under his own power.  Otabil and a colleague subsequently picked him up and got him back into his room.

Dollinger testified that the facility had no policy or process requiring that surveillance video be reviewed daily.  Instead, per Cusate, senior management would review randomly selected hours of footage monthly to make sure that mental health technicians were making their rounds as they were supposed to.  This meant that, although multiple Foundations executives

could have seen what happened between Otabil and B.C. the night of the incident, they did not necessarily see it.  Dollinger testified that she only reviewed this videotape after she was made aware of the police's suspicion that Otabil had abused B.C.

B.C. had another encounter with Otabil two days later, which came to light after B.C. left Foundations.  When Otabil was prosecuted for his abuse of B.C., Dollinger testified that, per surveillance video that she had reviewed, in this second incident, B.C. attempted to enter another patient's room.  He did not have permission to do that, and Otabil redirected back to his own room by shoving him.  When asked about this second incident in his deposition, Otabil testified, consistent with notes in his rounds documents, that B.C. was acting very aggressively, having grabbed at a nurse's neck.

Dollinger elaborated in her deposition testimony in this case that Otabil's actions on both days were inconsistent with his training, were not authorized by Foundations, and did not help provide B.C. a safe and secure environment at Foundations.  Again, according to Dollinger, this footage was not reviewed until after the authorities had gotten involved because there was no policy of conducting such reviews.

Two versions of how B.C.'s injuries were discovered are present in the record.  Dollinger testified that video surveillance at Foundations from two days after this second incident captured B.C. approaching a staff member naked, which prompted the provider to examine his groin.  But B.C.'s chart instead indicates that, while showering B.C., staff noticed a large bruise around his groin, which was tender to the touch.  Regardless of how the injury was discovered, B.C. then was sent to be assessed by Foundations's medical team.  Later that morning, he was sent to the Doylestown Hospital emergency room, from which he was eventually transferred to the Childrens Hospital of Philadelphia ("CHOP").  There, he was treated for bruising from his

umbilicus to his penis with a concomitant splenic laceration.  Per CHOP's records, when B.C. had left home, he only had some small bruises on his thigh from the family dog, but when he arrived at the hospital, doctors observed "significant bruising" in his pelvic area.  CHOP doctors diagnosed him with "severe inflicted trauma (physical abuse)."

Within a week of the first incident, the police and child protective services informed Foundations that they had been made aware that B.C. had been abused while at the facility. After Dollinger reviewed the video footage, she concluded that Otabil had "acted inconsistent with facility practices," and cooperated with investigating authorities.  On Dollinger's recommendation to Foundations's Human Resources department, Otabil was fired.  He was subsequently charged with two counts of abuse of a care-dependent person, a misdemeanor, and two counts of harassment, a summary offense.  After a bench trial, he was convicted on one abuse count and one harassment count, for which he was sentenced to two years' probation.  As one of the conditions of his sentence, Otabil is no longer allowed to work in any type of dependent-care job.

The parties do not dispute that, when he was hired, Otabil cleared a criminal background check for prior instances of child abuse.  After his hiring, he went through a week of training. Defendant Donna Newton-Putignano, Senior Director of Behavioral Services at Foundations, was responsible for training mental health technicians like Otabil.  Per her testimony, this included two hours of training on autism and applied behavioral analysis.  Technicians' training also covered how to verbally de-escalate situations with patients who were being aggressive, properly redirecting patients to where they needed to be, and the handle-with-care technique to safely hold patients when necessary.  At Otabil's criminal trial, Dollinger testified that this technique was to be used only in cases of "imminent risk either . . . to self or others."  Per

Newtown-Putignano, the training did not cover assisting patients in daily-life tasks such as showering and getting dressed.  Otabil did not recall receiving any autism-specific training outside of the topic of restraints.  He testified that he felt capable of caring for the patients in the Magnolia unit when he started working at Foundations.

In their briefing, Plaintiffs argue that, although Otabil passed his background check, his behavior with another Foundations patient should have put the hospital on notice that he was dangerous.  Another minor, R.M., was a patient at Foundations in the Magnolia unit just weeks before B.C. arrived.  R.M.'s file included a restrictive intervention order signed by a doctor that, per Dollinger's testimony, allows healthcare personnel to place their hands on a patient in case of imminent health and safety risks (Dollinger did not recall B.C.'s file containing such an order).  R.M.'s restrictive intervention order listed Otabil as one of his caregivers.  While at Foundations, R.M. suffered injuries, including a bruise in the shape of a handprint, which led the facility to file a child abuse report.  Although no individual perpetrator was ever identified, and no criminal charges were filed, Bucks County Child Protective Services did conclude that abuse had taken place.

B.C.'s carers have noted that his emotional and psychological condition has worsened markedly since he left Foundations.  His family therapist maintains he has post-traumatic stress disorder ("PTSD").  This has made him "overly anxious if a family member is not home, not able to accept any new situations and asked to leave his school due to behavior from the PTSD."  B.C.'s psychiatrist similarly has noted his "heightened separation anxiety" and "flashbacks" since leaving Foundations, symptoms "consistent with [PTSD]."  His psychiatrist suspects that B.C. "will need long-term treatment including, but not limited to, medication and therapy" to manage these symptoms.

## II.    LEGAL STANDARD

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "Material facts are those that could affect the outcome of the proceeding."  *Roth v. Norfalco LLC*, 651 F.3d 367, 373 (3d Cir. 2011) (internal quotation marks and citation omitted).  "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact."  *Id.* (citation omitted).  A moving party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Celotex*, 477 U.S. at 323.

"Inferences to be drawn from the underlying facts contained in the evidential sources must be viewed in the light most favorable to the party opposing the motion." *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987); *see also Scott v. Harris*, 550 U.S. 372, 378 (2007) (cautioning that "courts are required to view the facts and draw *reasonable* inferences" in favor of the nonmoving party (emphasis added)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

## III.   DISCUSSION

### A.  Defendants' Omnibus Arguments

Many of Defendants' arguments in favor of summary judgment cut across the counts in the Amended Complaint.  First, they argue that they all are "entitled to immunity" under Pennsylvania's Mental Health Procedures Act, 50 Pa C.S. § 7101, *et seq.* ("MHPA").  Second, Foundations and the UHS Defendants argue that, to the extent claims against them are premised on corporate negligence, a vicarious liability theory, or through piercing the corporate veil, they cannot be held liable.  Third, the Defendants argue that Plaintiffs had to, but failed to, establish the standard of care for their tort claims with expert testimony.  These arguments are addressed below before turning to the substance of each count.

#### i.     *Applicability of the MHPA*

The MHPA "protects from civil and criminal liability those individuals and institutions that provide treatment to mentally ill patients, and thus promotes the statutory goal of ensuring such treatment remains available." *Dean v. Bowling Green-Brandywine*, 225 A.3d 859, 869 (Pa. 2020) (citation omitted).  It provides that "a director of a facility, a physician, . . . or any other authorized person who participates in a decision that a person be examined or treated under [the] act . . . shall not be civilly or criminally liable for such decision or for any of its consequences" in the absence of "willful misconduct or gross negligence."  50 Pa. C.S. § 7114(a); *Leight v. Univ. of Pittsburgh Physicians*, 243 A.3d 126, 130 (Pa. 2020) (citation omitted).  An "authorized person" "encompass[es] organizational entities, including corporations, partnerships and associations as well as natural persons." *Farago v. Sacred Heart Gen. Hosp.*, 562 A.2d 300, 303 (Pa. 1989); *see* 1 Pa. C.S. § 1991.  That means that, although under Pennsylvania law,

negligence, gross negligence, and recklessness are not separate causes of action, but rather different "degree[s] of deviation from the standard of care" that fall under a single cause of action, *Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 19 (Pa. 2019); *see also Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 215 n.2 (3d Cir. 2010), covered persons are immune from liability for mere negligence.

Plaintiffs do not dispute that the MHPA applies to each Defendant in this case. *Kevin C. v. Foundations Behavioral Health*, 2021 WL 3737206, at *5 n.6 (E.D. Pa. Aug. 24, 2021). Moreover, by addressing the claims together and arguing that Defendants were grossly negligent in carrying out their duties under each of them, Plaintiffs also appear to have conceded that the MHPA applies to not only their gross negligence/recklessness claim, but also their claims for breach of fiduciary duty and NIED.[6]  That said, as will be discussed further below, whether the MHPA applies to those claims does not affect their disposition here because a rational factfinder could conclude that Foundations was grossly negligent in carrying out those duties, and no rational factfinder could conclude that the UHS Defendants were even negligent in carrying out those duties.

## ii.   *The Scope of Corporate Liability*

Many of Plaintiffs' claims sound in tort.  But applicable law permits them to proceed with such claims against the corporate defendants—Foundations, UHSD, and UHSI—only under certain circumstances.  Raised here are distinct theories of liability—piercing the corporate veil, direct corporate negligence, and vicarious liability—which are explained below.

---

[6] Indeed, the plain meaning of the MHPA's text points in this direction too.  Section 7114 says that covered individuals "shall not be civilly or criminally liable" for a specific degree of misconduct—mere negligence, as opposed to "willful misconduct or gross negligence"—without limitation to any specific cause of action.  50 Pa. C.S. § 7114(a).

a.   Piercing the Corporate Veil

Defendants argue that while UHSI and UHSD could theoretically be held liable for their own conduct,[7] they cannot be held liable for the conduct of their subsidiaries.  "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries."  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks and citations omitted).  Such liability can be established only if the circumstances justify piercing the corporate veil, which the UHS Defendants argue is not justified here.

Applying Pennsylvania choice-of-law principles,[8] the law of the state in which an entity is incorporated determines whether a plaintiff may pierce the corporate veil.  *Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 158 A.3d 203, 236 (Pa. Commw. 2017), *aff'd in part, rev'd in part on other grounds sub nom. Commonwealth ex rel. Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010 (Pa. 2018) (holding that because, "[u]nder Pennsylvania law, the existence and extent of shareholder liability . . . is determined by the law of the state of incorporation," the law of the state of incorporation also governs whether a corporation is subject to veil-piercing (citing *Broderick v. Stephano*, 171 A. 582 (Pa. 1934))).  Both UHSD and UHSI are incorporated in Delaware, so that state's corporate law applies here.

Piercing the corporate veil is inappropriate unless "some 'fraud or injustice' would be perpetrated through misuse of the corporate form."  *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical, France*, 2004 WL 5366102, at *7 (Del Ch. Mar. 4, 2004) (citing *Mobil Oil Corp. v.*

---

[7] But they contend that Plaintiff did not plead and there is no evidence attributing any alleged conduct to either entity.

[8] A district court sitting in diversity applies the choice-of-law principles of the state it is in.  *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006) (citations omitted).

*Linear Films, Inc.*, 718 F. Supp. 260, 265-68 (D. Del. 1989)); *see also Trevino v. Mescorp, Inc.*, 583 F. Supp.2d 521, 530 (D. Del. 2008) ("[T]he fraud or injustice that must be demonstrated in order to pierce a corporate veil law must be found in the defendants' use of the corporate form." (internal quotation marks and citations omitted)).  Plaintiffs make no effort to explain why that happened here and do not respond to Defendant's argument that there is no evidence in the record to warrant piercing the corporate veil.  Accordingly, any cause of action against UHSI's and UHSD shall be dismissed unless it is premised on those Defendants *own* duties, actions, and conduct.

### b.  Vicarious Liability

But that is not the end of the story:  Absent piercing the corporate veil, tort actions against a corporate entity that are premised on that entity's own duties, actions, or conduct (as opposed to its subsidiary's) can proceed under two "distinct theories of recovery:" (1) vicarious liability; or, (2) direct corporate negligence.  *Scampone v. Grane Healthcare Co.*, 169 A.3d 600, 622 (Pa. Super. 2017) (*Scampone III*); *see also Thompson v. Nason Hosp.*, 591 A.2d 703, 708 (Pa. 1991).

Importantly, these theories address different types of misconduct: "A cause of action for corporate negligence arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees.  Thus, under this theory, a corporation is held directly liable, as opposed to vicariously liable, for its own negligent acts." *Welsh v. Bulger*, 698 A.2d 581, 585 (Pa. 1997) (citation omitted).  But "multiple entities" cannot be "exposed to liability for breach of the same non-delegable duties," so a plaintiff proceeding under a direct corporate negligence theory must establish the *prima facie* case of negligence with respect to each corporate defendant.  *Scampone v. Highland Park Care Ctr., LLC*, 57 A.3d 582, 606-07 (Pa. 2012) (*Scampone II*).

The contours of the vicarious liability doctrine are limned by a series of cases in the *Scampone* litigation, which also illustrates the differences between and applicability of each theory.  In *Scampone*, the estate of a deceased woman sued the nursing home where she had lived and the parent company that managed it, arguing that the facility's understaffing led to her death.  *Id.* at 584-85.  At the close of the estate's evidence, the Court of Common Pleas dismissed the management company from the case.  *Id.* at 585.  The jury subsequently found the facility itself both directly and vicariously liable for negligence.  *Id.* at 586.  But the Supreme Court of Pennsylvania reversed and remanded the case to Court of Common Pleas to allow the estate to proceed against the management company if a cognizable duty of care could be established.  *Id.* at 607.

On remand, the Court of Common Pleas again concluded that the management company could not be held directly or vicariously liable because it did not owe the decedent a duty of care, but the Superior Court reversed.  *Scampone III*, 169 A.3d at 609-10, 622-23.  The estate had a valid cause of action premised on direct corporate negligence because the management company had assumed a duty to render services necessary for the decedent's protection, as evidenced by the company's responsibility for: (1) quality assurance in the facility; (2) the facility's staffing budget; and, (3) hiring and training the facility's nurses.  *Id.* at 617-18.  The estate could not recover damages from the management company under this theory, however, because this was the same non-delegable duty that the facility owed to the decedent, for which the facility "retained legal responsibility."  *Id.* at 621 (citation omitted).

But the estate could proceed against the management company under a vicarious liability theory because, even though the facility handled residents' day-to-day healthcare needs, the management company had sent "supervisory personnel" to the facility each week who "were

14

involved in the daily care of patients" and "reviewed the daily reports of the care provided to each patient." *Id.* at 622.  Thus, the claim against the management company was "premised upon the Plaintiff's assertion that [it] was vicariously liable for the acts and omissions of its employees in performing" its "*in situ* direct supervisory role in the hands-on care rendered to" the decedent. *Id.* at 622-23.

Applying these principles, the first question to be addressed is whether this record would allow Plaintiffs' tort claims to proceed against Foundations and the UHS Defendants on a vicarious liability theory.

### 1. Foundations

Defendants argue that allowing Plaintiffs to press a vicarious liability theory is inappropriate here because Otabil's criminal abuse of B.C. fell outside the scope of his employment at Foundations.  As a general rule, an employer "is liable for the acts of his servant which are committed during the course of and within the scope of the servant's employment." *Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1271 (Pa. Super. 1979) (citations omitted). Pennsylvania courts rely on the Restatement (Second) of Agency to determine the breadth of the scope of one's employment.  *See Justice v. Lombardo*, 208 A.3d 1057, 1067 (Pa. 2019).  An act will fall within the scope of one's employment if:

> (1) it is of a kind and nature that the employee is employed to perform;
> (2) it occurs substantially within the authorized time and space limits;
> (3) it is actuated, at least in part, by a purpose to serve the employer; and
> (4) if force is intentionally used by the employee against another, the use of force is not unexpected by the employer.

*Costa v. Roxborough Mem'l Hosp.*, 708 A.2d 490, 493 (Pa. Super. 1998) (citation omitted); *see* Restatement (Second) of Agency § 228 (Am. L. Inst. 1958).  Under the Restatement, "liability of the employer may extend even to intentional or criminal acts committed by the servant."

*Fitzgerald*, 410 A.2d at 1271 (citations omitted); *see also Brumfield v. Sanders*, 232 F.3d 376, 381 (3d Cir. 2008) (noting that "unauthorized acts" that are "clearly incidental to [an employer's] business" are not necessarily outside the scope of employment (internal quotation marks and citation omitted)).  "Where, however, the employee commits an act encompassing the use of force which is excessive and so dangerous as to be totally without responsibility or reason, the employer is not responsible as a matter of law."  *Fitzgerald*, 410 A.2d at 1272.  Thus, assaults committed "for personal reasons or in an outrageous manner" are "not actuated by an intent of performing the business of the employer and [are] not done within the scope of employment."  *Id.*  On the other hand, an employer "can reasonably anticipate that servants may commit minor crimes in the prosecution of the business," even if "serious crimes" would fall outside the scope of employment.  Restatement (Second) of Agency § 231(a).  "[W]hether a particular act of an employee is within the scope of his employment is ordinarily a question of fact for the jury" unless "neither the facts nor the inferences to be drawn from them are in dispute."  *Justice*, 208 A.3d at 1068 (citations omitted).

Here, the question of whether Otabil's misconduct fell within the scope of his employment at Foundations must go to the jury.  Whether his use of force against B.C. was "of a kind and nature" he was hired to perform and that he employed that force "substantially within the authorized time and space limits," *Costa*, 708 A.2d at 493 (citation omitted), set by Foundations, is in genuine dispute.  While Dollinger and Newton-Putignano testified that Otabil would not have been trained to shove or spank B.C. in the way that he did, the analysis does not end there because unauthorized conduct can still fall in the scope of one's employment if it is "nevertheless so similar to or incidental to the conduct authorized that it is still within the scope of employment."  *Justice*, 208 A.3d at 1067 (quoting Restatement (Second) of Agency § 229(2)).

Here, Bachman, Newton-Putignano, and Cusate explained that mental health technicians like Otabil would be responsible for redirecting patients like B.C. as necessary and for cleaning him and his room after he soiled himself.  That is what Otabil was doing at the time of the incident at issue in this litigation—indeed, that was part of his  job as a mental health technician. Redirection necessarily involves some degree of force.  Whether the degree of force Otabil employed was of the "kind and nature" Foundations trained him to perform and whether he employed it in "authorized time and space" is for the jury to decide.

Moreover, a rational jury could, in viewing the videotape in which it appears that Otabil's colleagues neither reacted nor intervened during the interactions between him and B.C., infer that such force was not unexpected and was not considered beyond the pale in the facility.  *See, e.g.*, *Straiton v. Rosinsky*, 133 A.2d 257, 259 (Pa. Super. 1957).  It also is worth noting that Otabil's crime, a misdemeanor, does not share much in common with the "serious" offenses that tend to fall outside the scope of one's employment.  *See, e.g.*, *Nichols v. Land Transp. Corp.*, 103 F. Supp.2d 25, 28 (D. Me. 1999) (treating stabbing a colleague as a serious crime under the Restatement); *Lou-Con, Inc. v. Gulf Building Servs., Inc.*, 287 So.2d 192, 200 (La. Ct. App. 1973) (treating arson as a serious crime under the Restatement); *Howard v. Zaney Bar*, 85 A.2d 401, 402 (Pa. 1952) (treating shooting a bar patron in the neck for making advances on another customer as outside the scope of employment).

Accordingly, summary judgment shall not be granted on Plaintiffs' causes of action for gross negligence/recklessness, assault and battery, or IIED based on Foundation's vicarious liability for Otabil's conduct.[9]

---

[9] Because the Court construes Plaintiff's NIED claim as alleging that Foundations breached duties that it owed directly to B.C., that claim is not premised on vicarious liability for Otabil's misconduct and will be addressed separately below.

## 2. *The UHS Defendants*

But the same cannot be said for the UHS Defendants.  Otabil's misconduct while working for their subsidiary is not automatically imputed to its corporate parents, UHSI and UHSD.  Defendants argue that these entities cannot be held vicariously liable for any gross negligence because the record is bereft of any evidence of a direct duty of care to B.C. or other evidence of misconduct.

They are correct.  The UHS Defendants did not have the same day-to-day involvement in patient care or exercise the degree of control over care at the facility that is necessary to sustain a vicarious liability claim against them.  True, Cusate said that he believed that he drew a paycheck from UHS directly after the company bought Foundations, and Fusco's testimony and resume both indicated that UHSD was her employer when she worked there.  And Dollinger said she was trained in risk management by UHS, too.  But these connections still fall well short of the "*in situ* direct supervisory role in . . . hands-on care rendered" seen in *Scampone III*.  169 A.3d at 623.  Even if Fusco and Cusate could be considered "supervisory personnel" like the nursing consultants in that case, a rational jury could not conclude that they engaged in the same "daily care of patients" as was necessary for the Superior Court to conclude that a cause of action for vicarious liability was appropriate there.  *Id.* at 622.  Moreover, multiple Foundations leaders who do not appear to have been UHS employees, such as Dollinger and Newton-Putignano, directed patient care, training providers and setting staffing levels as they deemed appropriate without specific direction from UHS.  Therefore, the UHS Defendants cannot be held vicariously liable for B.C.'s injuries under Plaintiffs' claims for gross negligence/recklessness, assault and

battery, or IIED.[10]

### iii.    *Expert Testimony*

#### a.    This Is Not a Medical Malpractice Action

Defendants next characterize Plaintiffs' tort claims as medical malpractice claims, which, in that they are not supported by expert testimony, must fail under Pennsylvania law.  Indeed, where a defendant's negligence "is not obvious," in "a traditional medical malpractice action . . . a plaintiff must produce expert testimony to establish that the hospital deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm to the plaintiff."  *Welsh*, 698 A.2d at 585; *see also Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003).  On the other hand, "[e]xpert testimony is not required 'where the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even nonprofessional persons.'" *Welsh*, 698 A.2d at 585 n.11 (quoting *Chandler v. Cook*, 265 A.2d 794, 796 n.1 (Pa. 1970)).

Plaintiffs argue that these rules are beside the point because they do not bring a medical malpractice action.  The line between a medical malpractice claim and an ordinary negligence claim against a healthcare provider can be blurry.  *See Toogood*, 824 A.2d at 1145.  Pennsylvania courts have identified "two defining characteristics" of medical malpractice claims: "First, medical malpractice can occur only within the course of a professional relationship.  Second, claims of medical malpractice necessarily raise questions involving medical judgment.  Claims of ordinary negligence, by contrast, raise issues that are within the common knowledge and experience of the [factfinder]."  *Ditch v. Waynesboro Hosp.*, 917 A.2d 317, 322 (Pa. Super. 2007) (quoting *Grossman v. Barke*, 868 A.2d at 570 (Pa. Super. 2005)).  The operative complaint

---

[10] As with Foundations, the Court addresses the NIED claim against the UHS Defendants separately below.

determines whether a plaintiff has brought a medical malpractice action rather than an ordinary negligence action. *Grossman*, 868 A.2d at 568-70.

The key question in analyzing the Amended Complaint is whether Plaintiffs are alleging B.C. received medical care in a manner inconsistent with the relevant professional standard. For example, in *Smith v. Friends Hospital*, the plaintiff's complaint alleging that she had been beaten and sexually assaulted while hospitalized sounded in ordinary negligence. 928 A.2d 1072, 1073-74, 1076 (Pa. Super. 2007). The Superior Court reasoned that the "allegations against the Hospital center *only* around claims that the Hospital failed to properly employ and supervise the [employees], who allegedly perpetrated the sexual and physical assaults on Appellant, and that the Hospital failed to create an environment where such acts could not occur." *Id.* at 1076. While their misconduct "pertain[ed] to an action that occurred within the course of a professional relationship, they clearly do not raise questions involving medical judgment beyond the realm of common knowledge and experience." *Id.* A lawsuit seeking accountability for sexual and physical abuse "is not predicated upon substandard medical treatment, that is, acts involving 'diagnosis, care and treatment by licensed professionals.'" *Id.* (quoting *Ditch*, 917 A.2d at 322). Conversely, a complaint alleging that a hospital "owed duties to [the plaintiff], including but not limited *to treating her sensitivity to anesthesia competently*, respecting the information she conveyed regarding her recovery, *treating the difficult recovery completely* and to do all that without further harming her or destroying her employment" was a medical malpractice claim "because an ordinary, non-medical professional would not have a duty to treat [her] sensitivity to anesthesia completely or treat her difficult recovery completely." *Doe v. Hosp. of Univ. of Pa.*, 546 F. Supp.3d 336, 347 (E.D. Pa. 2021).

In this respect, Plaintiffs' Amended Complaint is similar to the one at issue in *Smith*. The

Amended Complaint alleges negligence, gross negligence, and recklessness because Defendants failed "to ensure that [B.C.'s] program was safe, appropriate, properly staffed and supervised by appropriately trained individuals" and breached "a duty of care to prevent" Otabil's physical abuse by failing to adequately train, staff, and supervise the hospital.  As was the case in *Smith*, while these duties exist because B.C. was under Defendants' medical care, the specific standard of care that Plaintiffs allege was breached does not implicate any "questions involving medical judgment." *Ditch*, 917 A.2d at 322.  Plaintiffs allege a breach of a duty of care that non-medical professionals would have owed B.C.  Therefore, Plaintiffs' unintentional tort claims sound in negligence and are not medical malpractice claims and do not require expert testimony to proceed.

b.  Any Alleged Direct Corporate Negligence Is Not "Obvious"

However, "claims of corporate negligence"—claims that "arise[] from the policies, actions, or inaction of the institution itself"—"where the hospital's negligence is not obvious" do require "expert testimony to establish that the hospital deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm to the plaintiff." *Welsh*, 698 A.2d at 585.  And that is one of the theories under which Plaintiffs proceed here when alleging gross negligence/recklessness.  The allegations that these entities "breached their duty to duty to adequately hire, train, supervise, and discipline [Foundations's] staff" and "to provide B.C. a safe, secure, and adequately staffed treatment program" closely track what the Supreme Court of Pennsylvania described in *Welsh* as the quintessential bases for a direct corporate negligence action. *Id.*; *see also Moser v. Heistand*, 681 A.2d 1322, 1325 (Pa. 1996) ("Because the duty to uphold the proper standard of care runs directly from the hospital to the patient, an injured party need not rely on the negligence of a third-party, such as a doctor or nurse, to establish a cause of action in corporate negligence.").  Thus, unless Foundations's and the UHS

21

Defendants' negligence was "obvious," expert testimony was necessary to sustain that count.[11] *Welsh*, 698 A.2d at 585.

Here, any corporate negligence was not obvious, so expert testimony was necessary, and plaintiffs cannot proceed using such a theory.  Plaintiffs' direct corporate negligence theory relies on Foundations's alleged failures to train Otabil, surround him with enough colleagues so B.C. could be adequately cared for, and monitor its surveillance systems to remove Otabil once he had abused B.C. the first time.  As presented here, the appropriate training regimen, staffing levels, or video-monitoring practices for Foundations and the UHS Defendants is not "within the range of the ordinary experience and comprehension" of a lay juror.  *Id.* at 585 n.11 (citations omitted).  Therefore, expert testimony on the standard of care was necessary, and Plaintiffs' failure to produce on-point evidence means that Foundations and the UHS Defendants are entitled to summary judgment on the gross negligence/recklessness claim in this respect.

### B.  Gross Negligence

The only remaining question with respect to Plaintiff's first count—for negligence, gross negligence and recklessness is whether the Individual Defendants summary judgment motion should be granted.  As stated *supra*, given the MHPA, no recovery can be had against these defendants for mere negligence.  50 Pa. C.S. § 7114(a).  The question now is whether, given the facts in record, the claim can survive on a gross negligence or recklessness theory.

As discussed above, Pennsylvania courts treat negligence, gross negligence, and recklessness as a single cause of action, differentiated only by the degree of departure from the standard of care.  *Feleccia*, 215 A.3d at 19; *see also Monroe v. CBH20, LP*, 286 A.3d 785, 799

---

[11] On the other hand, the Court construes Plaintiffs' breach of fiduciary duty, NIED, assault and battery, and IIED claims as based on the "specific acts of individual hospital employees" and thus as pressing vicarious liability claims.  *Welsh*, 698 A.2d at 585.

(Pa. Super. 2022) ("[G]ross negligence and recklessness are states of mind; they are forms of negligence, not independent causes of action.").  The *prima facie* case for this cause of action requires that a plaintiff establish: "(1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages."  *Toro v. Fitness Int'l LLC*, 150 A.3d 968, 976-77 (Pa. Super. 2016).  Gross negligence requires the breach to be "substantially more than ordinary carelessness, inadvertence, laxity, or indifference;" the complained of conduct must be a "flagrant, gross[] deviat[ion] from the ordinary standard of care."  *Albright v. Abington Mem'l Hosp.*, 696 A.2d 1159, 1164 (Pa. 1997) (citation omitted).  That said, the conduct need not "rise to the level of the intentional indifference or conscious disregard of risks." *Feleccia*, 215 A.3d at 20 (quotation marks and citations omitted).  Recklessness requires yet more—the defendant must have engaged in "wanton and willful misconduct."  *Archibald v. Kemble*, 971 A.2d 513, 519 (Pa. Super. 2009). "[I]t is generally true that the issue of whether a given set of facts satisfies the definition of gross negligence is a question of fact to be determined by a jury," and the issue can be decided as a matter of law only "if the conduct in question falls short of gross negligence, the case is entirely free from doubt, and no reasonable jury could find" otherwise.  *Albright*, 696 A.2d at 1164-65 (citations omitted).

Here, many of Plaintiffs' claims of gross negligence are subject to genuine disputes of fact because a rational jury could conclude that some of the Individual Defendants' conduct crossed the line from "ordinary carelessness" to "flagrant" misconduct.  *Albright*, 696 A.2d at 1164.  Summary judgment thus will be denied as to Fusco, Cusate, Newton-Putignano, Bachman, and Dollinger.  Each of these defendants had some supervisory role relating to provider training and staffing, and patient safety at Foundations.  A rational factfinder could

conclude that Fusco, Bachman, and Dollinger had access to the 24/7 feed of Foundations's surveillance cameras as well and thus would have been in a position to prevent the second interaction between B.C. and Otabil had they reviewed such footage daily.  Whether these individuals were grossly negligent in carrying out these duties is a question properly reserved for the jury.  *Id.*

No reasonable jury, however, could conclude that Monte was grossly negligent on this record.  A rational jury could not conclude that Monte either failed to supervise or train Otabil or improperly staffed the Magnolia unit.  Monte testified that she at times taught mental health technicians specific skills, including applied behavior analysis and the use of alternative communication techniques for working with non-verbal patients.  As a therapist, however, she did not have any supervisory role over mental health technicians or a more generalized responsibility for training them.  Therefore, she cannot be held vicariously liable for Otabil's abuse.  Nor is there any evidence that she directly caused any of B.C.'s injuries.  Therefore, she is entitled to summary judgment for gross negligence/recklessness.

### C.  Section 504

Plaintiffs' claim brought under Section 504 of the Rehabilitation Act, 29 U.S.C § 794, is made only against Foundations and the UHS Defendants.  Plaintiffs allege that these entities discriminated against B.C. on the basis of his disability in violation of that statute by failing to provide him "a safe and appropriate residential program . . . free from abuse and bodily harm," the extent of which he was unable to communicate to Foundations staff because of the hospital's decision to take away his iPad.

To succeed on a Section 504 claim, "a plaintiff must meet four requirements: 1) she is a '[disabled] individual,' 2) she is 'otherwise qualified' for participation in the program, 3) the

program receives 'federal financial assistance,' and 4) she was 'denied the benefits of' or 'subject to discrimination' under the program." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3d Cir. 1991)).  The UHS Defendants only dispute the last two of these elements, arguing that they are entitled to summary judgment because: (1) they are not "programs or activities" or "the 'recipients of federal financial assistance;'" (2) they did not intentionally discriminate against B.C. on the basis of disability; and, (3) they cannot be held liable for Otabil's or any other Foundations staff member's mistreatment of B.C.  Because it is not genuinely disputed on this record that whatever federal funds Foundations receives cannot be imputed to the UHS Defendants, they (but not Foundations)[12] are entitled to summary judgment on this claim.[13]

"[A]n entity does not become a 'recipient' of federal financial assistance simply by being an indirect beneficiary of federal funds." *McDonald-Witherspoon v. City of Philadelphia*, 481 F. Supp.3d 424, 440 (E.D. Pa. 2020).  Instead, Section 504 only covers "Congress' intended recipient," not "those who merely benefit from the aid." *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 607 (1986).  But "the intent of the grant-maker is not the only relevant consideration . . . .  Courts should also consider the degree to which the entity is able to control decisions made with respect to the money, the most important decision being whether the grant money should be accepted at all." *Smith v. Nat'l Collegiate Athletic Ass'n*, 266 F.3d 152, 161 (3d Cir. 2001).

---

[12] Because the UHS Defendants thus are not proper targets of a Section 504 suit on these facts, the Court does not address their second and third arguments in support of summary judgment.

[13] Having reviewed UHS's annual financial disclosures submitted to the Securities and Exchange Commission, the Court strongly suspects that the company in fact receives federal funds.  That said, Plaintiffs did not include these disclosures in the record and did not move the Court to take judicial notice of them.  In such instances, the Court is not obligated to take judicial notice of otherwise-admissible public records.  Fed. R. Evid. 201(c) (noting that a court "may take judicial notice on its own," but "must take judicial notice if a party requests it and the court is supplied with the necessary information"); *see also Britt v. Elm City Cmtys.*, 2019 WL 2452349, at *4 n.8 (D. Conn. June 12, 2019).

Here, it is not in genuine dispute that Foundations receives federal funds. Fusco conceded in her deposition testimony that the facility received Medicaid funding, and both Newton-Putignano and Cusate testified that they believed it received Medicare funding too. Both programs constitute "federal financial assistance" for purposes of Section 504 when the defendant "receives reimbursement through Medicare and Medicaid for the provision of some of its services." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 217 (2022); *see also Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 830 (11th Cir. 2017) ("As places of public accommodation and recipients of federal Medicaid funds, Defendants are obligated to follow the mandates of the ADA and [Section 504].")); *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1046 (5th Cir. 1984) (collecting cases).

The only question, then, is whether Foundations' status as a recipient of federal funds can be imputed to the UHS Defendants. Courts interpreting Section 504 and similar anti-discrimination statutes do not place talismanic significance on "the precise corporate form of the operations" to determine the scope of a parent company's liability. *Doe One v. CVS Pharmacy, Inc.*, 2022 WL 3139516, at *7 (N.D. Cal. Aug. 5, 2022) (citations omitted). Instead, the question is whether the UHS Defendants "exhibit[] 'controlling authority' over" Foundations. *Id.*; *see also Silva*, 856 F.3d at 842.

In line with these principles, in *Silva*, the Eleventh Circuit held that a parent company operating two hospitals was a proper defendant under Section 504 because: (1) it owned and operated the hospitals; (2) it controlled the faulty technological systems that gave rise to the Section 504 complaint; and, (3) it "applie[d] its various policies and procedures" to the hospitals. 856 F.3d at 842; *see also Tomei v. Parkwest Med. Ctr.*, 2022 WL 703656, at *7 (E.D. Tenn. Mar. 8, 2022). Similarly, in *Doe One*, a putative class action of people who had been diagnosed with

HIV/AIDS alleged that, by forcing them to purchase their drugs through a subsidiary specialty pharmacy to qualify for its lower, in-network price, CVS had discriminated against them on the basis of disability in violation of the Affordable Care Act.  2022 WL 3139516, at *2.  They sued a variety of CVS's component companies, including individual pharmacies, pharmacy benefit managers, and their corporate parents.  *Id.* at *2-3.  CVS argued that, because the responsibilities of filling prescriptions and administering its drug benefit plans had been disaggregated between different subsidiaries, some of which did not receive federal funds, the lawsuit could not proceed.  *Id.* at *3-5.  The district court rejected that argument, reasoning that dismissal on this ground would "ignore the overall interrelationship among the entities which . . . design and implement the allegedly discriminatory program."  *Id.* at *9.

For many of the same reasons why, as discussed above, finding the UHS Defendants vicariously liable for B.C.'s injuries would be improper, it is not in genuine dispute that a similar record of control over Foundations by the UHS Defendants is absent here.  In *Silva*, *Doe One*, and *Tomei*, the parent company did more than just own a subsidiary that served people with disabilities.  Instead, it exercised a meaningful amount of control over the precise program whose operation caused the alleged discriminatory conduct.  *Silva*, 856 F.3d at 842; *Doe One*, 2022 WL 3139516 at *2-4; *Tomei*, 2022 WL 703656, at *7.

Here, in contrast, even though Foundations is a wholly owned subsidiary of UHS, the record lacks the same evidence of control over the circumstances at Foundations that gave rise to Otabil's abuse.  While some Foundations executives drew a salary from UHS, there is little evidence that the staffing, training, and assistive technology policies that caused the alleged discrimination underlying Plaintiffs' Section 504 claim came from outside the facility.  For example, Dollinger testified that she was in charge of patient safety, physician scheduling, and

provider onboarding without reference to any supervision by UHS regarding these responsibilities.  Similarly, even though Fusco was a UHS employee, and she testified that she had supervisory responsibility over staffing levels and training at Foundations, she never indicated that UHS directed how she went about that work.  This record as it currently stands thus lacks evidence from which a rational jury could conclude that the UHS Defendants exercised the necessary "controlling authority" over Foundations to generate a genuine dispute over whether it counts as a recipient of federal funds as the facility's corporate parent.  *Doe One*, 2022 WL 3139516, at *7.  Thus, the UHS Defendants are entitled to summary judgment on Plaintiffs' Section 504 claim.  *See Hair v. Fayette Cnty. of Pa.*, 265 F. Supp.3d 544, 557 (W.D. Pa. 2017) (ruling that summary judgment is appropriate where the plaintiff "fails to direct this Court to any evidence in the record that [defendants] receive federal financial assistance").

Foundations, on the other hand, is not entitled to summary judgment on this claim.  While Defendants has requested that the Court "[d]ismiss" this claim against the UHS Defendants and Foundations "for failure to offer any evidence whatsoever," their summary judgment briefing only substantively attacks the claim on behalf of the hospital's corporate parents.  "[A]rguments raised in passing . . . but not squarely argued, are considered waived."  *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Grp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (citation omitted)).  Therefore, the Court cannot grant Foundations summary judgment on Plaintiffs' Section 504 claim.

### D.  The ADA

Plaintiffs claim against Foundations and the UHS Defendants under the ADA, which provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or lease to) or operates a

place of public accommodation,"[14] 42 U.S.C. § 12182(a), requests a "declaratory judgment and injunctive relief . . . to compel [them] to take all necessary steps to insure [sic.] that [they] adequately hire, train, staff and supervise their programs to avoid future injuries to B.C. and other individuals similarly situated."  This claim for injunctive relief will be dismissed because Plaintiffs do not have standing to pursue it.

In the typical case, "to satisfy Article III's standing requirements, a plaintiff must show[:] (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  Because standing is a "jurisdictional requirement," it "remains open to review at all stages of the litigation." *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994).  "At summary judgment, a plaintiff 'can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts' establishing standing." *Greenberg v. Lehocky*, 81 F.4th 376, 384 (3d Cir. 2023) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013)).

To show that he or she has suffered an injury-in-fact in an action for injunctive relief like this one, "a plaintiff must show that he or she is likely to suffer future injury from defendant's threatened illegal conduct." *Roe v. Operation Rescue*, 919 F.2d 857, 864 (3d Cir. 1990) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).  In the context of Title III of the ADA,

---

[14] To prevail on a Title III claim, Plaintiffs "must show (1) discrimination on the basis of a disability; (2) in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation; (3) by the public accommodation's owner, lessor or operator." *Emanuel v. The Walt Disney Co.*, 2021 WL 2454462, at *3 (E.D. Pa. June 16, 2021) (internal quotation marks and citations omitted); *see also Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007) (citations omitted).

plaintiffs can establish that likelihood by demonstrating: (1) "intent to return to the place where the alleged discrimination took place and that upon such return, the same alleged discrimination will occur again" (intent to return); or, (2) "that he or she has actual knowledge of barriers preventing equal access and a reasonable likelihood that the plaintiff would use the facility if not for the barriers" (the deterrent effect doctrine). *Garner v. VIST Bank*, 2013 WL 6731903, at *5-6 (E.D. Pa. Dec. 20, 2013) (citations omitted).

Here, Plaintiffs summary judgment briefing does not explain why they fit into either paradigm. And the record does not contain any indication that B.C. will return to Foundations under any circumstances, regardless of whether the abuse he faced would happen again. While B.C. has on occasion exhibited the degree of violent behavior that necessitated his hospitalization in January 2019, his parents did not testify that they have considered having him admitted to Foundations since, even as new medications have been added to B.C.'s regimen. Therefore, Plaintiffs have not established injury-in-fact as required in a claim for injunctive relief under Title III of the ADA and do not have standing to sue. Defendants are entitled to summary judgment on Plaintiffs' ADA claim.

### E. Breach of Fiduciary Duty

Foundations and the UHS Defendants argue that they are entitled to summary judgment on Plaintiffs' breach of fiduciary duty claim because: (1) no such relationship existed here; and, (2) even if one existed, they were not grossly negligent in performing it.[15] Whether a fiduciary relationship existed between Foundations and B.C. is subject to multiple disputes of fact, so

---

[15] The Court understands Plaintiffs to have conceded in their summary judgment briefing that the MHPA applies to this claim. Whether they have done so does not affect the analysis because a rational factfinder could conclude that Foundations was grossly negligent on this record, and the UHS Defendants are entitled to summary judgment on this count independent of whether they were grossly negligent.

Foundations is not entitled to summary judgment on Plaintiffs' claim that they breached such a duty.  But Plaintiffs have failed to establish that the UHS Defendants had such a duty, so they are entitled to summary judgment.

Under Pennsylvania law, to succeed on a breach of fiduciary duty claim, the plaintiff must prove that: (1) a fiduciary relationship exists; (2) the defendant "failed to act in good faith and solely for" that party's benefit; and, (3) that party "suffered an injury caused by [the defendant's] breach."  *Snyder v. Crusading Servicing Corp.*, 231 A.3d 20, 31 (Pa. Super. 2020) (citations omitted).  Plaintiffs bear the burden of establishing the existence of a fiduciary relationship.  *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 22 (Pa. Super. 2002) (citation omitted).

The "essence" of a fiduciary relationship "is trust and reliance on one side, and a corresponding opportunity to abuse that trust for personal gain on the other" such that "circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, *or*, on the other, weakness, dependence or trust, justifiably reposed."  *Basile v. H & R Block, Inc.*, 777 A.2d 95, 101 (Pa. Super. 2001) (quoting *Frowen v. Blank*, 425 A.2d 412, 416-17 (Pa. 1981)).  Mere undue influence is not enough; there must be "evidence that decision-making power was effectively ceded to another."  *Yenchi v. Ameriprise Fin., Inc.*, 161 A.3d 811, 822 (Pa. 2017) (citation omitted).  Such a relationship can exist as a matter of law— for example, between an attorney and client and other arrangements not relevant here—or it can exist "based on the facts and circumstances apparent on the record."  *Basile*, 777 A.2d at 102; *see also Rebidas v. Murasko*, 677 A.2d 331, 334 (Pa. Super. 1996) (citation omitted) ("The existence of a confidential relationship, in all but a few instances which are not applicable here, is a question of fact to be established by the evidence.").

A doctor-patient or similar medical relationship can give rise to such a duty in certain circumstances, such as when a physician analyzes an ultrasound and fails to detect abnormalities in the fetus. *Toney*, 36 A.3d at 117-18. But unless the plaintiff can "assert or explain . . . how [the defendant healthcare provider] failed to deal with him on equal terms, . . . or how [defendant] used its position to [plaintiff's] detriment and to its own advantage, or how he had anything akin to [a] patient-doctor relationship," a breach of fiduciary duty claim cannot proceed. *Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 218-19 (Pa. Super. 2012); *see also Alfrey v. Whitley*, 2022 WL 1750466, at *5 (M.D. Pa. May 31, 2022).

### i.  Foundations

Here, Plaintiffs allege a fiduciary relationship existed between B.C. and Foundations because, per the Amended Complaint, he "reposed a special confidence in [them] to the extent that [they] did not deal with each other on equal terms, due to B.C.'s disabilities, as well as his dependence and justifiable trust on Defendants and their personnel." Drawing all permissible inferences in Plaintiffs' favor, whether B.C.'s disabilities placed him in sufficient repose such that he was not on equal terms with Foundations is at the very least in genuine dispute.

Although Plaintiffs' summary judgment briefing does not expound the precise nature of the fiduciary relationship between Defendants and B.C., the record does extensively describe B.C.'s disabilities and the circumstances surrounding his time at Foundations from which a rational factfinder could conclude that he could not meaningfully advocate for himself or chart a course for his own care. For one, it is undisputed that B.C. is nonverbal. And a rational jury could infer that being at Foundations made it even harder for B.C. to communicate. His medical records from CHOP indicated that, when his parents visited him at Foundations, B.C. appeared "comatose" to them. In addition, Foundations staff took his iPad away, depriving him of the familiar means of expressing his needs. Although Foundations replaced that iPad with a PECS

32

board, it stands to reason that B.C.'s limited ability to communicate with his caregivers was further hampered by this switch. At the very least, whether these circumstances amount to a fiduciary relationship is in genuine dispute. Therefore, Foundations is not entitled to summary judgment on Plaintiffs' breach of fiduciary claim or NIED claim.[16]

### ii.   The UHS Defendants

But Plaintiffs have failed to carry their burden to establish a fiduciary relationship between B.C. and the UHS Defendants. Plaintiffs point to nothing in the record, let alone any genuine dispute of material fact, that leads the Court to conclude that duty should be imputed to its corporate parent. Again, *Scampone* is instructive. A fiduciary duty is non-delegable. *Huber v. Taylor*, 469 F.3d 67, 81-82 (3d Cir. 2006) (noting that, in the context of an attorney-client relationship, which "includes undivided loyalty," "[e]ven if the duty of disclosure is itself delegable, the duty of loyalty is inherently not, and in this case disclosure was necessary to fulfill the duty of loyalty"). And *Scampone* teaches that a defendant and its corporate parent cannot be held directly liable for breach of the same non-delegable duty. *Scampone II*, 57 A.3d 582, 606-07. Therefore, the UHS Defendants could not be liable for breach of the same fiduciary duty that Foundations had to B.C. Nor is there any record evidence that the UHS Defendants had an independent fiduciary duty to B.C. Plaintiffs therefore cannot proceed with their breach of fiduciary duty claims against the UHS Defendants.

### F.   Negligent Infliction of Emotional Distress

The *prima facie* case of NIED contains the same elements as the *prima facie* case of

---

[16] And for the same reasons that Foundations is not entitled to summary judgment for gross negligence/recklessness on a vicarious liability theory, it is incorrect that "[t]he record is simply devoid of evidence that" it "failed to act in good faith." Should it conclude that a fiduciary duty exists, a rational jury could find based on the footage of Otabil's abuse of B.C., B.C.'s condition when his parents visited him, testimony about how he was left isolated in his room, and his injuries, that Foundations did not act in good faith in carrying out that duty.

negligence discussed above, but a plaintiff can recover only under certain "factual scenarios," such as "where the defendant had a contractual or fiduciary duty toward the plaintiff." *Toney v. Chester Cnty. Hosp.*, 961 A.2d 192, 197-98 (Pa. Super. 2008), *aff'd*, 36 A.3d 83 (Pa. 2011); *see also Jordan v. Pa. State Univ.*, 276 A.3d 751, 774 (Pa. Super. 2022). Foundations and the UHS Defendants attack Plaintiffs' NIED claim by arguing that these necessary preconditions for recovery—gross negligence and a fiduciary relationship—are absent here.[17] But, for reasons discussed above, both are factual questions subject to genuine dispute as against Foundations, so the facility is not entitled to summary judgment on this count. Conversely, it is not in genuine dispute that the UHS Defendants did not owe B.C. such a duty, and Plaintiffs cannot proceed against them under either a direct corporate negligence or vicarious liability theory. Therefore, the UHS Defendants are entitled to summary judgment on this count.

### G.  Assault and Battery

Foundations and the UHS Defendants argue that they are entitled to summary judgment on Plaintiffs' claim of assault and battery because it "is merely a vicarious liability claim for Otabil's actions." But for the reasons discussed above, summary judgment is improper with respect to a vicarious liability claim against Foundations because whether Otabil was acting within the scope of his employment is a jury question in this case. Although Otabil has not moved for summary judgment, this count is premised on his misconduct, and a rational jury could find that he had committed the tort of assault and battery based on this record. Under Pennsylvania law, a battery requires (1) "offensive contact with the person of another;" and, (2) "inten[t] to cause" such a contact. *Montgomery v. Bazaz-Sehgal*, 742 A.2d 1125, 1130 (Pa. Super. 1999) (quoting Restatement (Second) of Torts § 18(1) (Am. L. Inst. 1965)). An assault,

---

[17] Again, the Court understands Plaintiffs to have conceded that the MHPA applies to this claim.

34

in turn, is "an act intended to put another in reasonable apprehension of an immediate battery, which succeeds in causing an apprehension of such a battery." *D'Errico v. DeFazio*, 763 A.2d 424, 431 n.2 (Pa. Super. 2000).  Video surveillance captures Otabil spanking B.C., and a rational jury could conclude based on B.C.'s position and relative stillness that Otabil intended to strike him.  Similarly, a rational jury could infer from B.C.'s decision to go to ground after being shoved that Otabil successfully had put him in apprehension of another battery.

On the other hand, such a claim cannot proceed against the UHS Defendants because, as discussed above, they did not exercise the degree of operational control over Foundations necessary for vicarious liability to extend to the facility's corporate parent.  Summary judgment therefore will be granted for the UHS Defendants.

## H.  Intentional Infliction of Emotional Distress

Foundations and the UHS Defendants argue that they are entitled to summary judgment on Plaintiffs' IIED claim because they "have no cause of action."[18]  Pennsylvania courts permit plaintiffs to recover for IIED where the defendant: (1) intentionally or recklessly; (2) has engaged in "outrageous or extreme conduct;" which, (3) causes emotional harm so severe that it manifests physically.[19]  *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1122-23 (Pa. Super. 2004).  The misconduct must be "so outrageous in character, so extreme in degree, as to

---

[18] Defendants also argue that a vicarious liability theory is unavailable here, but for the reasons explained above, that is not the case, as the factual question of whether Otabil was acting within the scope of his employment at Foundations is in genuine dispute.

[19] Unlike Plaintiffs' NIED claim, their IIED claim is based not on a fiduciary duty owed to B.C., but on the injuries he suffered.  Only immediate family members "'present at the time' of the tortious conduct," however, may recover for emotional distress inflicted on a third party.  *See Weiley*, 51 A.3d at 216; *Taylor v. Albert Einstein Med. Ctr.*, 754 A.2d 650, 653 (Pa. 2000).  Despite being B.C.'s parents, Plaintiffs cannot recover on that basis because they were not at Foundations when he was abused.  *See Schutt v. Melmark, Inc.*, 186 F. Supp.3d 366, 379 (E.D. Pa. 2016).  Thus, the Court construes this claim as being brought by Plaintiffs in their capacity as B.C.'s guardians, rather than in their individual capacities.  *See Mondelli v. Berkeley Heights Nursing and Rehab. Ctr.*, 1 F.4th 145, 148 (3d Cir. 2021) (citing Fed. R. Civ. P. 17(c)(1)) ("Rule 17 sets forth examples of representatives who may sue or defend on behalf of an incompetent person, such as a general guardian, a committee, a conservator, or a like fiduciary.").

go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable

in civilized society." *Hoy v. Angelonia*, 720 A.2d 745, 754 (Pa. 1998) (quotation omitted).  "[I]t

is for the court to determine in the first instance whether the defendant's conduct may reasonably

be regarded as so extreme and outrageous to permit recovery." *Johnson v. Caparelli*, 625 A.2d

668, 671 (Pa. Super. 1993) (citations omitted); *see also Betz v. Satteson*, 259 F. Supp.3d 132, 195

& n.341 (M.D. Pa. 2017).

Plaintiffs cannot clear the high bar that Pennsylvania courts have set for what constitutes

outrageous or extreme conduct.  Their IIED claim is grounded in Defendants' alleged "lack of

concern and demeaning conduct toward[s] and comments to B.C.," B.C.'s "expressed . . . fears

and concerns during [his] treatment," and his subsequent PTSD diagnosis.  True, in the video of

Otabil abusing B.C., his colleagues betray no concern for his physical safety.  Instead, they only

intervene to assist Otabil in cleaning B.C. and his room.  But Pennsylvania IIED jurisprudence

demands more.  For example, in *Schutt v. Melmark, Inc.*, the plaintiffs alleged that the residential

care facility at which their non-verbal son resided had transported him to a crisis center, where

he was abandoned without his medical records, so the crisis center could not effectively manage

his seizure medication.  186 F.3d at 371-72.  As a result, "Schutt was confined, sedated, not

permitted to bathe for eight days and, eventually had several seizures." *Id.* at 379.  This conduct

was outrageous enough to state a claim for IIED (although the claim failed on other grounds).

*Id.*  And in another case, the Superior Court affirmed a jury's finding of IIED against a doctor

who left his patient on the emergency room floor for up to two hours and ordered hospital staff

not to pick him up off the floor.  *Hoffman v. Memorial Osteopathic Hosp.*, 492 A.2d 1382, 1385

(Pa. Super. 1985).

While it no doubt would have been better if Otabil's colleagues had registered concern

for B.C.'s safety (and if Foundations administrators had reviewed their hospital's video surveillance before he hit B.C. again), that failure in judgment pales in comparison to what happened to the victims in *Schutt* and *Hoffman*.[20]  Therefore, Defendants are entitled to summary judgment on Plaintiff's claim of IIED.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted in part and denied in part.  An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**

---

[20] And while Plaintiffs alleged that B.C. had been "locked in his room alone and in the dark for hours at a time," it is not genuinely disputed that the door to B.C.'s room locked only from the outside, so he was free to leave as he wished.